1  MOEEL LAH FAKHOURY LLP
   Hanni M. Fakhoury (State Bar No. 252629)
2  1300 Clay Street, Suite 600
   Oakland, CA 94612
3  Telephone:   (510) 500-9994
   Email:       hanni@mlf-llp.com
4

5  Attorneys for Jonathan Soong

6

7                    IN THE UNITED STATES DISTRICT COURT

8              FOR THE NORTHERN DISTRICT OF CALIFORNIA

9                        SAN FRANCISCO DIVISION

10

11  UNITED STATES OF AMERICA,          **Case No.:** 3:22-CR-00372-SI

12           Plaintiff,                **DEFENDANT'S SENTENCING
                                       MEMORANDUM, MOTION FOR
13       v.                            DOWNWARD VARIANCE AND
                                       OBJECTION TO PRESENTENCE
14  JONATHAN SOONG,                    INVESTIGATION REPORT**

15           Defendant.               **Court:**        Courtroom 1, 17th Floor
                                      **Hearing Date:** April 28, 2023
16                                    **Hearing Time:** 11:30 a.m.

17

18

19

20

21

22

23

24

25

26

27

28

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES...................................................................................................II

INTRODUCTION.................................................................................................................1

STATEMENT OF FACTS.....................................................................................................1

    A.    Mr. Soong's upbringing. .....................................................................................1

    B.    Mr. Soong's job as the STA Program administrator at USRA. .........................3

    C.    The export of CIFER to Beihang University. .....................................................4

    D.    Mr. Soong confesses, returns the money he embezzled and is fired from USRA. ...........6

    E.    Mr. Soong's arrest and guilty plea.....................................................................7

    F.    Mr. Soong's future plans.....................................................................................9

SENTENCING ARGUMENT .............................................................................................12

    A.    Seriousness of the Offense, Respect for the Law and Just Punishment........................13

    B.    Deterring Criminal Conduct and Protecting the Public. ..................................14

        1.    Mr. Soong's post offense rehabilitation demonstrates he has been deterred. .........................................................................................14

        2.    The Sentencing Commission recognizes zero criminal history point offenders have the lowest risk of recidivism and can be spared imprisonment. ..................................................................................15

    C.    Providing Training, Medical Care or Other Treatment. ..................................17

    D.    The Guidelines Sentencing Range. .................................................................17

        1.    The base offense level is 14 under U.S.S.G. § 2M5.1(a)(2). .............17

        2.    Regardless of the Guideline range, all parties agree a variance is appropriate. ..................................................................................22

    E.    Avoiding Unwarranted Sentencing Disparities. ............................................23

    F.    Providing Restitution. ......................................................................................24

OBJECTIONS TO PROPOSED SUPERVISED RELEASE CONDITIONS ....................................24

    A.    The computer and Internet restrictions are not reasonably related to the offense. .........25

    B.    The proposed conditions impose greater restrictions on liberty than necessary.............26

CONCLUSION .................................................................................................................27

DEFENDANT'S SENTENCING MEMORANDUM, MOTION FOR DOWNWARD VARIANCE AND PSR OBJECTIONS
*United States v. Soong*, 3:22-CR-00372-SI

i

1

**TABLE OF AUTHORITIES**

2

**Cases**

3   *Concepcion v. United States*, 142 S. Ct. 2389 (2022) .................................................................. 14

4   *Flores-Chavez v. Ashcroft*, 362 F.3d 1150 (9th Cir. 2004) .......................................................... 20

5   *Gall v. United States*, 552 U.S. 38 (2007) ............................................................... 12, 13, 14, 23

6   *Kennedy v. Louisiana*, 554 U.S. 407 (2008) ................................................................................ 13

7   *Koon v. United States*, 518 U.S. 81 (1996) ................................................................................. 14

8   *Pepper v. United States*, 562 U.S. 476 (2011) ....................................................................... 14, 22

9   *Tapia v. United States*, 564 U.S. 319 (2011) ............................................................................... 13

10  *Tin Cup, LLC v. United States Army Corps of Engineers*, 904 F.3d 1068 (9th Cir. 2018)................. 20

11  *United States v. Amezcua-Vasquez*, 567 F.3d 1050 (9th Cir. 2009).............................................. 23

12  *United States v. Avila*, 719 F. App'x 591 (9th Cir. 2017) ........................................................... 26

13  *United States v. Bad Marriage*, 392 F.3d 1103 (9th Cir. 2004) .................................................. 17

14  *United States v. Barker*, 771 F.2d 1362 (9th Cir. 1985) ............................................................. 12

15  *United States v. Barsumyan*, 517 F.3d 1154 (9th Cir. 2008).................................................. 25, 26

16  *United States v. Carty*, 520 F.3d 984 (9th Cir. 2008) (en banc).................................................. 12

17  *United States v. Elashyi*, 554 F.3d 480 (5th Cir. 2008) .............................................................. 18

18  *United States v. Hanna*, 661 F.3d 271 (6th Cir. 2011) ............................................................... 18

19  *United States v. LaCoste*, 821 F.3d 1187 (9th Cir. 2016) .................................................. 24, 25, 26

20  *United States v. McKeeve*, 131 F.3d 1 (1st Cir. 1997) ................................................................ 18

21  *United States v. Min*, 2000 WL 1576890 (S.D.N.Y. Oct. 23, 2000) ............................................ 18

22  *United States v. Ruff*, 535 F.3d 999 (9th Cir. 2008) .................................................................... 14

23  *United States v. Sales*, 476 F.3d 732 (9th Cir. 2007) .................................................................. 26

24  *United States v. Sevilla*, 2006 WL 3486872 (N.D. Ill. Nov. 29, 2006) ........................................ 18

25  *United States v. Trujillo*, 713 F.3d 1003 (9th Cir. 2013)............................................................. 14

26  *United States v. Vasquez*, 160 F.3d 1237 (9th Cir. 1998) ............................................................ 14

27  *Williams v. New York*, 337 U.S. 241 (1949)............................................................................... 12

28

DEFENDANT'S SENTENCING MEMORANDUM, MOTION FOR DOWNWARD VARIANCE AND PSR OBJECTIONS
*United States v. Soong*, 3:22-CR-00372-SI

ii

**Statutes**

18 U.S.C. § 3553 ..............................................................................................*passim*

18 U.S.C. § 3565 ............................................................................................... 13

18 U.S.C. § 3582 ............................................................................................... 17

22 U.S.C. § 2778 ............................................................................................... 21

50 U.S.C. § 1701 ............................................................................................... 19

50 U.S.C. § 1705 ..................................................................................................7

50 U.S.C. § 4813 ............................................................................................... 18

**Regulations**

15 C.F.R. § 744.3 .............................................................................................. 20

15 C.F.R. § 744.11 ............................................................................................ 20

**United States Sentencing Guidelines ("U.S.S.G.")**

U.S.S.G. § 2H1.1 ............................................................................................... 16

U.S.S.G. § 2M5.2 .......................................................................................... 21, 24

U.S.S.G. § 3E1.1 ............................................................................................... 22

U.S.S.G. § 5C1.1 ......................................................................................... 16, 17

U.S.S.G. § 5D1.3 ............................................................................................... 25

**Other Authorities**

Baber, et al., "A Viable Alternative? Alternatives to Incarceration Across Seven Federal Districts,"

    *Federal Probation* Vol. 83, no. 1 (Jun 2019) ............................................... 15

Mark Tischler, et. al., "Aircraft and Rotorcraft System Identification," 2nd Ed., AIAA Education

    Series, 2012 ....................................................................................................5

San Jose State University, Research Foundation, Flight Control, CIFER® .........................7

U.S. Department of Commerce, Bureau of Industry and Security, "Entity List" .................6

U.S. Department of Commerce, International Trade Administration, "Export Control Classification #

    (ECCN) and (EAR99)" ....................................................................................5

U.S Sentencing Commission, "'Back in Business' U.S. Sentencing Commission Acts to Make

    Communities Safer & Stronger," Apr. 5, 2023 ........................................... 15

DEFENDANT'S SENTENCING MEMORANDUM, MOTION FOR DOWNWARD VARIANCE AND PSR OBJECTIONS
*United States v. Soong*, 3:22-CR-00372-SI

iii

**INTRODUCTION**

In his letter to the Court, Jonathan Soong writes that May 25, 2022, the day of his arrest, "was a rude awakening," the day "when my deepest and darkest secret finally came out in the open." Exhibit A-1, Jonathan Soong Letter. But it was also a day that brought Mr. Soong "a tremendous sense of relief," as he could "finally be truthful about" his actions, and "begin a personal journey of self-redemption to right my wrongs." *Id.* He has spent the past 11 months reflecting "on the <u>what</u>, the <u>whys</u>, and the <u>hows</u> of my unfortunate situation," contemplating on the poor decisions that will brand him a convicted felon for the rest of his life.

Mr. Soong is beyond remorseful for his actions. He writes "I am sorry, Judge Illston, that we have to meet this way. I am deeply sorry to USRA and to the government for tainting the prestigious USRA program. I will forever regret that I chose selfishness over integrity and country." Exh. A-3, Jonathan Soong Letter.

There is no need to send Mr. Soong to prison. As all parties agree, a downward variance from the U.S. Sentencing Guideline range is appropriate in this case. Mr. Soong asks this Court to sentence him to five years of probation with the condition he participate in mental health treatment and counseling. He also asks this Court to order him to offset the restitution amount of $168,885.00 by the $161,010.00 he has already repaid to USRA.

**STATEMENT OF FACTS**

**A.  Mr. Soong's upbringing.**

Mr. Soong was born in Oakland in 1987. Presentence Investigation Report ("PSR") ¶ 63. His parents had immigrated from Hong Kong, in search of a better life in America. Mr. Soong's sister Jennifer explains, "My father worked a night shift and my mother worked a day shift at a restaurant and a night shift at a grocery store. They never complained about working hard because they knew they were providing for us." Exh. B-3, Jennifer Soong Letter. But that also meant the family did not spend much time together, and were not close emotionally. PSR ¶ 64. The family "did not talk about our feelings or say 'I love you' or hug each other." PSR ¶ 65. Mr. Soong grew up believing "that as a man, crying or expressing feelings was a sign of weakness." Exh. A-3, Jonathan Soong Letter.

Instead, the most important thing to his parents was success, which had to be earned through

DEFENDANT'S SENTENCING MEMORANDUM, MOTION FOR DOWNWARD VARIANCE AND PSR OBJECTIONS
*United States v. Soong*, 3:22-CR-00372-SI

1

1   hard and perhaps thankless work. Jennifer elaborates

2       There were two Chinese concepts they taught us: 勤快 (Qin Kuai) and 吃苦 (Chi Ku).
3       Qin Kuai means to work diligently and cheerfully without complaint because life
        doesn't promise to be easy. Chi Ku literally means eating bitterness, signifying that life
4       is going to be hard, painful, and may include suffering. They emphasized that you have
        to work hard to obtain the reward. Our parents reminded us that instead of complaining,
5       we should do our job and have delight in having done the hard work. Having struggled
        so much financially, their definition of success amounted to the size of your
6       compensation.

7   Exh. B-1, Jennifer Soong Letter. So "getting good grades was the number one priority in order to

8   even come close to achieving the American Dream." Exh. A-2, Jonathan Soong Letter.

9       When Mr. Soong was in elementary school, his parents divorced, and he and his sister split

10  their time with both of their parents. PSR ¶ 64. His father eventually remarried, but "forbid him from

11  telling his mother about the marriage." PSR ¶ 66. Keeping the existence of his stepmom a secret from

12  his mother was "hard and confusing" for Mr. Soong, because he was told at a young age that he had

13  to lie. *Id.* To make matters worse, Mr. Soong's stepmother—who cared for Mr. Soong and his sister

14  while their father was at work—did not speak much English and they did not "develop a meaningful

15  relationship in part due to a language barrier." PSR ¶ 64.

16      Mr. Soong's material needs were met but he did not have "many nice things" and "was often

17  told 'no' when I wanted the latest toys or shiny objects." Exh. A-2, Jonathan Soong Letter. Mr.

18  Soong ultimately grew up "obsessed with money and savings, so I could decide on my own whether

19  or not I could afford or need something, rather than being told I couldn't have it all." *Id.*

20      Mr. Soong graduated high school in 2005, and after two years at De Anza Community College,

21  transferred to the University of California, Irvine, where he earned his bachelor's degree in 2009.

22  PSR ¶ 76. Mr. Soong met his wife, Stephanie Chau, in college. Although he grew up emotionally

23  neglected, Stephanie "sensed a kindred spirit in him," finding him to be "a naturally empathetic

24  caretaker," someone who "supported me in my mission in life" with a nurturing kindness,

25  compassion, and encouragement" that "he gives to all of his friends and family." Exh. B-1, Stephanie

26  Chau Letter.

27      Mr. Soong's friends from college, who he is still close with today, found him "trustworthy and

28  dependable." Exh. B-9, Justin Santa Ana Letter. His friend Alex Tran notes "When I was unable to

1    pay rent in college, he did not think twice on lending me money for the short time. When I was

2    stranded at a bus stop in the late night, he was the first person I called. He dropped what he was doing

3    to pick me and get me home. When I endured the death of my brother due to cancer, he was always

4    there to keep my spirits up." Exh. B-6, Alex Tran Letter. Another friend, Adam L., explains Mr.

5    Soong "will always go out of his way to help a friend in need." Exh. B-5, Adam L. Letter.

6          After dating for ten years, Mr. Soong married Stephanie in 2018. PSR ¶ 67. He is close to his

7    nieces and nephews in his life. His brother-in-law John Collins writes "Jon is the kind of uncle that

8    gets on the floor with [his niece] and enthusiastically plays when they're together." Exh. B-8, John

9    Collins Letter. His sister-in-law Tiffany Chau explains "Jon has been such a light not only in our

10    nieces and nephews' lives, but also my own children's lives. I have two daughters, ages 4 and 18

11    months. It has been a joy seeing him as an uncle and a wonderful role model to them. The kids

12    always ask for their Uncle Jon as he will make them feel like they are the center of the room when he

13    engages with them. They truly feel the love he radiates." Exh. B-14, Tiffany Chau Letter.

14    **B.**    **Mr. Soong's job as the STA Program administrator at USRA.**

15          In 2011, Mr. Soong got a job at the University of California, Santa Cruz ("UCSC"), which had

16    been previously awarded a contract from NASA to administer the Software Transfer Agreement

17    ("STA") program. PSR ¶ 84. The STA program was a collaboration between NASA and the U.S.

18    Army to license and distribute aeronautics related flight control software. PSR ¶ 11. In 2016, NASA

19    ended its contract with UCSC and transferred the STA contract to Universities Space Research

20    Association ("USRA"). PSR ¶ 10. Mr. Soong's job at UCSC was then transferred to USRA. PSR ¶

21    83. At USRA, Mr. Soong was the STA program administrator who conducted business with software

22    licensees. PSR ¶ 15.

23          Mr. Soong was unhappy at USRA. He writes in his letter that he "felt like it was a job and not a

24    career" with "monotonous duties." Exh. A-1, Jonathan Soong Letter. He did not "see[] much growth

25    or a long-term future in that position" and unlike his friends and colleagues, did not feel "a sense of

26    purpose and drive." *Id.* He "rarely talked about work because when I told people I worked for USRA

27    at NASA, it wasn't as interesting as it sounded like it should be since I was only a low-level admin."

28    *Id.* Mr. Soong's friend Alex explains "I never really knew what he did for NASA. It seemed he was

DEFENDANT'S SENTENCING MEMORANDUM, MOTION FOR DOWNWARD VARIANCE AND PSR OBJECTIONS
*United States v. Soong*, 3:22-CR-00372-SI

3

1   not too proud to share his title or position." Exh. B-6, Alex Tran Letter.

2       Despite his unhappiness, Mr. Soong was unwilling and unable to pursue a career change. His

3   sister Jennifer explains, "We were taught that with hard work, the money would come." Exh. B-3,

4   Jennifer Soong Letter. Yet there was a cultural conflict: "American culture values stating your career

5   wishes and desires, while Chinese philosophy, such as Qin Kuai and Chi Ku, states that you should

6   work hard and then the praise, salary increase, and career advancement would eventually follow on

7   its own. Jonathan worked hard but received only minimal salary raises." Exh. B-3, Jennifer Soong

8   Letter. She could see Mr. Soong was unhappy but "He did not advocate for himself because it wasn't

9   a muscle that was ever exercised in our household. Instead of looking for another job, he continued to

10  work even harder in hopes that would get him the recognition he deserved." *Id.* In hindsight, Mr.

11  Soong candidly admits "if I was more career-oriented, I would have left on my own accord before

12  everything spiraled out of control." Exh. A-1, Jonathan Soong Letter. But as his sister explains, "[i]n

13  the end, his low morale justified–in his mind–exercising poor judgment, and that is what has brought

14  us here today." Exh. B-4, Jennifer Soong Letter.

15  **C.**    **The export of CIFER to Beihang University.**

16      The software administered by the STA program at issue in this case is CIFER, which stands for

17  "Comprehensive Identification from Frequency Responses." CIFER was software that allowed a user

18  to develop a dynamic model of an aircraft based on collective flight test data; the model could then be

19  used for the analysis and design of an aircraft control system. Exh. D at USRA-000888. The software

20  was marketed for unmanned aerial vehicle ("UAV") development.[1] As one of USRA's aerospace

21  engineers explained, "a pilot will do a flight test, collect the data, and CIFER will be able to identify,

22  capture, and generate the dynamic behavior of an aircraft. This model can then be used for designing

23  a control system for analysis or design purposes. None of the flight data is contained in the software

24  itself; the user has to have its own flight test data." Exh. D at USRA-000888. The software was

25  originally developed by the Army, but contractors have added to it over the years. *Id.* The algorithm

26  underlying the software has not changed since development. Exh. D at USRA-000891. In 2012, the

---

[1] UAVs are colloquially known as drones.

DEFENDANT'S SENTENCING MEMORANDUM, MOTION FOR DOWNWARD VARIANCE AND PSR OBJECTIONS
*United States v. Soong*, 3:22-CR-00372-SI

4

1   Army made clear CIFER was in the public domain and not government property. Exh. E, NASA-

2   000065. Today, anyone can buy a textbook containing the algorithm and formulas at the heart of the

3   CIFER software for $120 from Amazon.com.[2] Users who purchase the textbook receive a student

4   version of the CIFER software.

5       In 2001, the Commerce Department classified CIFER as "EAR 99" for export purposes. Exh. D

6   at USRA-000891. Items classified as EAR99 "are not specifically controlled for export" and

7   "generally consist of low-technology consumer goods and do not require a license in most

8   situations."[3] While "EAR99 items can generally be exported without a license," if the "proposed

9   export of an EAR99 item is to an embargoed country, to an end-user of concern, or in support of a

10  prohibited end-use," an exporter "may be required to obtain a license."[4]

11      As the administrator of the STA program at USRA, Mr. Soong was the primary point person

12  for users seeking to purchase CIFER. If they were located within the United States—meaning there

13  would be no export—it was a straightforward transaction. Mr. Soong would provide the user with a

14  price quote; if accepted he would prepare a purchase agreement, the user would remit payment, and

15  Mr. Soong would send a link for the user to download the software, as well as a license key to

16  effectively "open" the software. If the user were located abroad—and thus the software would be

17  exported—the user had to be screened to ensure they were not from an embargoed country, a

18  prohibited end-user, or were intending to use the software for a prohibited end-use.

19      In 2017, Mr. Soong received an inquiry from a representative of Beihang University in China,

20  seeking to purchase CIFER. PSR ¶ 18. Mr. Soong ran Beihang through the consolidated screening list

21  and learned it was included on the government's "Entity List." PSR ¶ 19. The "Entity List" consists

22  of "foreign persons—including businesses, research institutions, government and private

23  organizations, individuals, and other types of legal persons—that are subject to specific license

---

24

25  [2] Mark Tischler, et. al., "Aircraft and Rotorcraft System Identification," 2nd Ed., AIAA Education
    Series, 2012, *available at* https://www.amazon.com/Aircraft-Rotorcraft-System-Identification-
26  Education/dp/1600868207.

27  [3] U.S. Department of Commerce, International Trade Administration, "Export Control Classification
    # (ECCN) and (EAR99), *available at* https://www.trade.gov/eccn-and-export-administration-
    regulation-ear99.
28
    [4] *Id.*

DEFENDANT'S SENTENCING MEMORANDUM, MOTION FOR DOWNWARD VARIANCE AND PSR OBJECTIONS
*United States v. Soong*, 3:22-CR-00372-SI

5

1    requirements for the export, reexport and/or transfer (in-country) of specified items."[5] Individuals

2    and businesses may end up on the "Entity List" because they engage in activities that are "contrary to

3    U.S. national security and/or foreign policy interests."[6]

4    Despite knowing that Beihang was on the "Entity List," in August 2017 Mr. Soong arranged

5    the sale of CIFER to Beihang. He used a third-party intermediary not on the "Entity List," Beijing

6    Rainbow Technical Development Ltd., to mask the fact that Beihang was the ultimate recipient of the

7    software. PSR ¶ 20. Mr. Soong explains he "justified to myself that only students were using it and I

8    had always been told that the software itself is harmless and essentially an engineering version of

9    Microsoft Excel." Exh. A-1, Jonathan Soong Letter. "The thought of giving a competitive advantage

10   to China never crossed my mind. I was oblivious and didn't understand the bigger picture or

11   consequences." *Id.*

12   **D.    Mr. Soong confesses, returns the money he embezzled and is fired from USRA.**

13   In June 2020, NASA informed USRA that it was reviewing—and thinking of not renewing—its

14   contract with USRA to administer the STA program contract. USRA hired a small law firm to

15   conduct an internal investigation. Later in the summer of 2020, USRA interviewed Mr. Soong about

16   the export to Beihang. After initially denying any wrongdoing, Mr. Soong ultimately admitted he

17   knew that Beihang was on the "Entity List" and a license—which he did not have—was needed to

18   export CIFER to the university. PSR ¶ 32.

19   He also told USRA that there was something else he wanted to get off his chest, specifically

20   that he had embezzled money from customers who wanted to pay license fees by credit card. He

21   directed customers to pay through Square and PayPal accounts he controlled and that were linked to

22   his personal bank account. PSR ¶¶ 34-36. He justified the payments as giving himself a "bonus" for

23   his hard work. PSR ¶ 34. Mr. Soong writes "I admittedly thought I was clever" but recognizes his

24   "foolishness and disregard for better judgment." Exh. A-1, Jonathan Soong Letter. On September 18,

25   2020, he wrote a check to USRA for $161,010, which reflected the amount of money he had diverted

26

27   [5] U.S. Department of Commerce, Bureau of Industry and Security, "Entity List," *available at*
     https://www.bis.doc.gov/index.php/policy-guidance/lists-of-parties-of-concern/entity-list.

28   [6] *Id.*

DEFENDANT'S SENTENCING MEMORANDUM, MOTION FOR DOWNWARD VARIANCE AND PSR OBJECTIONS
*United States v. Soong*, 3:22-CR-00372-SI

6

from the sale of software licenses. PSR ¶ 35. USRA understandably fired Mr. Soong immediately after his admissions. NASA ultimately did not renew its contract with USRA; it instead awarded the contract to San Jose State University.[7]

While working at USRA, Mr. Soong also worked a second job as an IT professional with Lockheed Martin, a job he also lost after Lockheed learned Mr. Soong was under federal investigation for the export violation. PSR ¶ 81. Freed from these "two lackluster jobs," Mr. Soong began to "concentrate on my IT career" and "solidif[ied] my technical skills through training courses and certifications." Exh. A-2, Jonathan Soong Letter; PSR ¶ 77 (listing certificates). In May 2021, he got a new IT job, finding the work challenging. PSR ¶ 81. He could "now see a rewarding career path, one that prevents complacency by demanding continuous learning from the ever changing technology." Exh. A-2, Jonathan Soong Letter. His friend Alex Tran noted when Mr. Soong "shifted towards Information Technology, there was a change in his energy. Since I am in the same field, we were able to have technical discussions and I was able to see his passion. I was able to bounce ideas off of him as he aided me in trying to forward my own career. Seeing how much harder he worked was exciting and he pushed me to do the same." Exh. B-6, Alex Tran Letter.

By May 2022, things were looking up for Mr. Soong: he was in a rewarding career, Stephanie had finished school and had just gotten her first full-time job as a nurse practitioner, and they were thinking about starting a family. Exh. B-2, Stephanie Chau Letter. But Mr. Soong's world came crashing down on May 25, 2022.

**E.    <u>Mr. Soong's arrest and guilty plea.</u>**

Four years after Mr. Soong exported CIFER to Beihang, and almost two years after he was terminated from USRA, the federal government filed a criminal complaint on May 23, 2022, charging Mr. Soong with violations of the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1705(c). PSR ¶ 2. Mr. Soong was arrested on the complaint on May 25, 2022, when more than a dozen federal agents knocked on his door in the early morning and took Mr. Soong away as Stephanie, sick with COVID, watched in disbelief. At his initial court appearance that

---

[7] *See* San Jose State University, Research Foundation, Flight Control, CIFER®, *available at* https://www.sjsu.edu/researchfoundation/resources/flight-control/cifer.php.

morning, he was released on a $25,000 unsecured appearance bond. PSR ¶ 5. He has been out of custody since his arrest and has not had any issues while on pretrial release. PSR ¶ 5.

Stephanie writes, "I was so incredibly surprised, hurt, and disappointed to learn about the actions that led to his arrest." Exh. B-1, Stephanie Chau Letter. She "had a hard time understanding why he would risk everything." *Id.* As Mr. Soong began telling his friends and family about his legal situation, the reaction was universally one of disbelief. As one friend writes, "learning about his case has left me dumbfounded." Exh. B-7, Janelle Sauz Letter.

College friend Adam L. explains "hearing about Jon's criminal charges for the first time was a complete shock for me. I was in complete disbelief and in denial, and cried that night after he told me. Jon has never been in any kind of trouble with the law or ever provided any indication of inappropriate behavior. I know that his primary focus is to be the best son and husband. I could never believe that he would do anything to jeopardize his family. It was hard for him to open up to me regarding the charge and I could see how distraught he was and I know that this is weighing on him heavily." Exh. B-5, Adam L. Letter.

Stephanie's sister Victoria says "When Jonathan opened up to me about the legal matter he was involved in, I honestly thought this was another one of his pranks, because of how far-fetched it was from the brother-in-law I know. To say I was in complete shock and disbelief is an understatement, because he is truly the LAST person I would have ever expected to plead guilty of a crime." Exh. B-15, Victoria Chau Letter. Another friend writes "it was a complete shock when he broke to news to me about his current case. I was confused and honestly, I still am. I can't imagine that Jon would ever do anything that would put himself or his loved ones in jeopardy." Exh. B-13, Olivia Lee Letter. The news impacted Mr. Soong's circle of friends. "The news of him being in this serious situation has sent a shockwave through our circle of friends and family. The thought of losing time with Jon is something we fear. We are still in disbelief that our most selfless and supportive friend had violated his workplace—where he has spent almost a decade of his life. We are disappointed because this is not characteristic of him and this does not reflect the outstanding man we know and respect." Exh. B-10, Kathleen Reyes Letter.

Mr. Soong had already admitted his misdeeds to USRA and returned the money he took from

them, and wanted to accept responsibility and the punishment he knew would come from his

mistakes. So he quickly entered into a plea agreement with the government. He waived his right to be

indicted, and an Information was filed on September 26, 2022, charging Mr. Soong with one count of

violating IEEPA. PSR ¶ 1. Mr. Soong appeared before this Court on January 10, 2023 and pleaded

guilty to the Information. PSR ¶ 3.

That court appearance "was an overwhelming moment," a "moment of incredible shame." Exh.

A-1, Jonathan Soong Letter. Mr. Soong is embarrassed that he "stumbled" and "blank[ed] out"

answering the Court's "simple question of how old I am." *Id.* He had been "forthright to everyone

I've spoken about this case to, but to do so in front of the court of law and to you, Judge Illston, made

it all that surreal." *Id.*

Despite the shame it brings him, Mr. Soong has been candid to his friends and family about his

mistakes. "I know he is remorseful, pled guilty, and is working to atone for his mistakes. He has

never shied from taking responsibility." Exh. B-6, Alex Tran Letter. His friend Justin says "Despite

letting down his family and friends, he has taken ownership of his faults and has been resilient in

these tough times. His courage and selflessness in atoning for his wrongdoings are admirable. From

this experience, I only grew to respect him more." Exh. B-9, Justin Santa Ana Letter.

His sister laments, "I hate that this mistake has painted over the fact that Jonathan is such a

loving, smart, kind, humble, and–most of all–caring gentleman. He is someone I still want my

daughter to be around and look up to despite this mistake. I know he has learned from this and will

never do something like this again or commit another crime. This incident has already set him back

so much mentally, physically, and professionally. I wish him to move past this so he can start a

family and a new career to support his family. With this felony conviction, he may no longer be able

to continue his current IT profession, with all the years of dedication and multiple certifications that

he's worked so hard to obtain." Exh. B-4, Jennifer Soong Letter.

## F.   Mr. Soong's future plans.

Obviously, dealing with a criminal case and awaiting sentencing in federal court has been

stressful for Mr. Soong. He explains, "after my arrest, and for the first time in my life, I felt broken."

Exh. A-2, Jonathan Soong Letter. In June 2022, Mr. Soong lost his IT job after his employer learned

1  about his arrest from a news article. PSR ¶ 81.

2      Stephanie writes "it was painful to see him work through his shame and release deep seated

3  emotions. I saw darkness replace the light, fun-loving partner I've always known. I saw social

4  withdrawal replace connection." Exh. B-1, Stephanie Chau Letter. Mr. Soong continues, he "shed so

5  many shameful tears to know my unpatriotic and selfish ways have tainted my family name and how

6  I have betrayed my ancestors and their dreams." Exh. A-2, Jonathan Soong Letter.

7      In January 2023, Mr. Soong decided to seek out mental health counseling and therapy for the

8  first time in his life. He was diagnosed with depression and anxiety, as well as "other specified

9  trauma and stressor related disorder," as he "reported extremely blaming himself for the stressful

10  experience and reports extremely having strong negative feelings such as fear, horror, anger, guilt, or

11  shame, which have left him feeling socially isolated from friends and sometimes family, as he wishes

12  to not burden them with his actions." Exh. C-5, Yellow Chair Collective Psychotherapy Treatment

13  Plan.

14      But good has come out of this ordeal; Mr. Soong explains "this legal experience has made me

15  come to terms that I need therapy to self reflect and to discover who I truly am." Exh. A-2, Jonathan

16  Soong Letter. He has "accepted that I have demons inside of me I need to address rather than

17  pretending like they weren't there if I kept them suppressed." *Id.*

18      Mr. Soong asks himself "nearly every day" the question of "why" this happened. Exh. A-1,

19  Jonathan Soong Letter. He believes it was "a culmination of my life experiences." *Id.* He felt

20  unsatisfied with his job at USRA, and "didn't respect the job as much as I should have." *Id.* He also

21  thinks about his childhood, where "being successful, whether it be in school or work, has been so

22  ingrained that I never realized how heavily it weighed on me. I attributed success with my salary"

23  and "I wanted so badly to succeed that I created a shortcut to success through embezzlement." Exh.

24  A-2, Jonathan Soong Letter. He believes "greed overwhelmed my conscience and I reasoned that the

25  secret embezzlement allowed me to stay complacent at USRA for as long as I did." *Id.*

26      "I now understand money has been the root of my downfall and I am working on putting less

27  emphasis on salary and money, by instead living in the moment and understanding that money isn't

28  everything. I can define my own meaning of success and happiness without correlating that to my

bank account." Exh. A-2, Jonathan Soong Letter. Fortunately, after his arrest he was able to find another job in the IT field, working for a small company in the Peninsula, though he lives with the constant fear that his employer may terminate him at any time because of his actions in this case. PSR ¶ 80.

Mr. Soong's loved ones see a marked change in him since he began attending therapy and has become more emotionally vulnerable. "This is a side of Jon that we have not seen before and it pains us to see how much his actions have affected him. He is deeply and sincerely apologetic for the mistake that he made. I know he has learned a lot about himself, and I admire his strength and adversity through these difficult times. If given another chance, I know he will find a way to give back as a contributor to society and be even more meticulous in his work." Exh. B-14, Tiffany Chau Letter.

Mr. Soong's wife Stephanie has "seen firsthand how hard he is trying to unpack the series of events that led him to his crimes." Exh. B-1, Stephanie Chau Letter. She has "seen a deep commitment in Jonathan to understand the root causes of his actions, as evidenced by his weekly therapy sessions, daily journaling, and the countless hard conversations he's had with our support system. He has approached those moments with incredible courage, transparency, and humility." *Id.*

Despite his mistakes, Mr. Soong's friends are sticking by him and committing to hold him accountable to ensure nothing like this ever happens again. "This case is not a true representation of Jon's character." Exh. B-7, Janelle Sauz Letter. His brother-in-law writes, the Court "can rest assured that we are surrounding Jon with love, support, and accountability through this process and beyond." Exh. B-8, John Collins Letter. Another friend explains "as members of his close circle, we will hold him accountable on his new journey in change and personal development. We know it will not be easy but we can now return the devotion and support he has poured into us in making sure he succeeds and never makes a dire mistake that would put his career and relationships in jeopardy again." Exh. B-11, Kathleen Reyes Letter.

"Although what has come of this situation truly shocked me, I will always be proud to call Jon my friend for I know that this is just a small aspect of all the good in him. Nothing changes for me. I stand by his side and am willing to attest to his character. Life is not always easy and tough

DEFENDANT'S SENTENCING MEMORANDUM, MOTION FOR DOWNWARD VARIANCE AND PSR OBJECTIONS
*United States v. Soong*, 3:22-CR-00372-SI

11

1    circumstances come our way. In life, I have learned that difficult choices present themselves and

2    good people make mistakes all the time. This is one of them." Exh. B-12, Nina Carlos Letter.

3        Mr. Soong's wife Stephanie writes "Jon has been, and will continue to be punished for his

4    crimes, whether physically incarcerated, or not." Exh. B-2, Stephanie Chau Letter. While she should

5    "be the most angry and betrayed by his actions and omissions," she "wholeheartedly forgive[s]

6    Jonathan and will challenge him to be better for the rest of our lives." *Id.*

7        Mr. Soong explains "I understand the consequences of my crime and not a day passes without

8    me fearing incarceration." Exh. A-3, Jonathan Soong Letter. He is "devastated" that Stephanie "has

9    to help shoulder the weight of the case, and that she has to deal with the fallout and repercussions of

10   something she had no involvement in, other than being with me." *Id.* But he also has "a whole new

11   perspective on life" and believes that this "hurdle…will only strengthen me for the next life

12   challenge." *Id.* He has "never experienced the range of emotions nor have cried as much in my life as

13   I have in the past 11 months. Initially, it started with embarrassment, anguish, and disgrace, but it has

14   since evolved into acceptance, growth, and how I can continuously learn from this incredibly difficult

15   life lesson." *Id.*

16                        **SENTENCING ARGUMENT**

17       Criminal "punishment should fit the offender and not merely the crime." *Williams v. New York*,

18   337 U.S. 241, 247 (1949). That requires "the sentencing judge to consider every convicted person as

19   an individual and every case as a unique study in the human failings that sometimes mitigate,

20   sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52

21   (2007) (quotations omitted). The factors detailed in 18 U.S.C. § 3553(a) assist the Court in fulfilling

22   this mandate to make "an individualized assessment of a particular defendant's culpability rather than

23   a mechanistic application of a given sentence to a given category of crime." *United States v. Barker*,

24   771 F.2d 1362, 1365 (9th Cir. 1985). The sentence recommended in the Sentencing Guidelines is

25   only one factor for district courts to consider in making this judgment, and it may not be weighed

26   more heavily than any other § 3553(a) factor. *Gall*, 552 U.S. at 50; *see also United States v. Carty*,

27   520 F.3d 984, 991 (9th Cir. 2008) (en banc).

28       As a first offender with zero criminal history points, Mr. Soong's felony conviction and the

1    stigma and difficulties finding work that will come from it are enough punishment. Given that he has

2    expressed deep remorse for his actions, repaid almost all the money he improperly took from USRA

3    before being charged, and has used this ordeal to understand and better himself through counseling

4    and therapy, there is no need to place Mr. Soong into custody to deter him from engaging in this kind

5    of behavior again in the future.

6         He respectfully requests this Court place him on probation for five years, with the condition he

7    continue participating in mental health counseling and therapy.

8    **A.     Seriousness of the Offense, Respect for the Law and Just Punishment.**

9         The Supreme Court has explained the factors in § 3553(a)(2)(A)—the seriousness of the

10   offense," the need "to promote respect for the law" and "provide just punishment for the offense"—

11   are the sentencing rationale of "retribution." *See Tapia v. United States*, 564 U.S. 319, 326 (2011) ("a

12   court may not take account of retribution (the first purpose listed in 3553(a)(2)) when imposing a

13   term of supervised release") (emphasis omitted). "The goal of retribution" is the "interest[] in seeing

14   that the offender is repaid for the hurt he caused." *Kennedy v. Louisiana*, 554 U.S. 407, 442 (2008).

15   Yet, the Supreme Court has warned "a sentence of imprisonment may work to promote not respect,

16   but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without

17   taking into account the real conduct and circumstances involved in sentencing." *Gall*, 552 U.S. at 54

18   (quotations omitted).

19        Mr. Soong acknowledges his mistakes and accepts he must be punished for them. But that has

20   been accomplished by his felony conviction and the collateral consequences stemming from his

21   actions, including losing multiple jobs and the fear that he could forever lose his IT career as a result

22   of his actions. Additionally, Mr. Soong has been under court ordered supervision for almost a year

23   and will continue to be supervised—and accountable to the Court—for the foreseeable future.

24        The Supreme Court has noted probation is not "an act of leniency" but "a substantial restriction

25   of freedom." *Gall*, 552 U.S. at 44. A probation sentence provides the Court with strong tools to

26   punish Mr. Soong if he violates any probation conditions. Under 18 U.S.C. § 3565(a)(2), the Court

27   may treat a probation violation either like a supervised release revocation proceeding or can revoke

28   probation and resentence the defendant anew on the underlying criminal charge, including to a term

of imprisonment followed by supervised release. *See United States v. Vasquez*, 160 F.3d 1237, 1238 (9th Cir. 1998).

Requiring Mr. Soong report to the probation office for five years (instead of only three years of supervised release if given a custodial sentence) ensures he is not only punished for his actions—with the threat of a potential custodial sentence hanging over his head if he violates any probation conditions—but also intensely supervised for a longer period by the Probation Office.

**B.    Deterring Criminal Conduct and Protecting the Public.**

Mr. Soong is certainly not a threat to the public. He was convicted of a non-violent offense that concluded almost five years ago; and he has not served—and will never serve again—in a fiduciary position and will never be able to access sensitive or classified government material. He has had perfect performance on pretrial release over the last year, an indicator of his ability to comply with court-imposed obligations and conditions.

Nor is a custodial sentence not needed to convince Mr. Soong not to commit another crime. As the letters provided to the Court attest, this case has caused Mr. Soong to reexamine himself and understand the root causes that ultimately brought him to this moment in his life. And as non-violent first offender with zero criminal history points, his risk of recidivism is low and proposed amendments to the Sentencing Guidelines going into effect on November 1, 2023 demonstrate that that the Sentencing Commission itself recognizes there is no need to place him in prison.

**1.    Mr. Soong's post offense rehabilitation demonstrates he has been deterred.**

Because a sentencing judge must "consider[] the whole person before him or her 'as an individual,'" they must "consider[] the defendant on that day, not on the date of his offense or the date of his conviction." *Concepcion v. United States*, 142 S. Ct. 2389, 2395-96 (2022) (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)). Thus a Court can consider "post-crime maturation and self-rehabilitation" at sentencing. *United States v. Ruff*, 535 F.3d 999, 1003 (9th Cir. 2008). The Supreme Court has "made clear that post-sentencing or post-offense rehabilitation—particularly in light of its tendency to reveal a defendant's likelihood of future criminal conduct—[is] a *critical factor* to consider in the imposition of a sentence." *United States v. Trujillo*, 713 F.3d 1003, 1010 (9th Cir. 2013) (citing *Pepper v. United States*, 562 U.S. 476, 491-93 (2011) and *Gall*, 552 U.S. at 59

(emphasis added)). Such rehabilitation is "the most up-to-date picture" of a defendant's history and characteristics, which in turn sheds light on whether a defendant will be deterred from committing another crime. *Pepper*, 562 U.S. at 492 (quoting 18 U.S.C. § 3553(a)(1)).

This criminal prosecution has certainly been a wakeup call for Mr. Soong and he is resolved to live a different life. Mr. Soong's success on pretrial release and his dedication to counseling demonstrates he learned his lesson and is unlikely to engage in criminal conduct again. A study published in the *Federal Probation* journal corroborates "the importance of defendants' success on pretrial services supervision as a harbinger of improved outcomes in subsequent stages of the criminal justice system," including "reduced failures during post-conviction supervision."[8]

Throughout his time on pretrial release, Mr. Soong has demonstrated he can comply with rules set by the Court and has not engaged in any criminal activity whatsoever. As explained in more detail below, he has also used this time to unpack the root causes of his actions, which in turn ensures he will not be likely to commit another crime again. Thus, Mr. Soong should be spared imprisonment so he can continue his counseling and hopefully keep his job.

### 2. The Sentencing Commission recognizes zero criminal history point offenders have the lowest risk of recidivism and can be spared imprisonment.

On April 5, 2023, the U.S. Sentencing Commission ("U.S.S.C.") approved preliminary amendments to the Guidelines which will go into effect on November 1, 2023, absent Congressional disapproval. PSR ¶ 111.[9] Within those preliminary Amendments is a new Guideline, U.S.S.G. § 4C1.1, which states for defendants with zero criminal history points meeting certain criteria, the district court should "decrease the offense level determined under Chapter Two and Three by 2 levels." Exh. F, Excerpt from U.S.S.C., Amendments to the Sentencing Guidelines (Preliminary), Apr. 5, 2023 at 11-12 (adding new U.S.S.G. § 4C1.1(a)). The amendment also changes the

---

[8] Baber, et al., "A Viable Alternative? Alternatives to Incarceration Across Seven Federal Districts," *Federal Probation* Vol. 83, no. 1, p. 8 (Jun 2019), *available at* https://www.uscourts.gov/sites/default/files/83_1_2_0.pdf.

[9] *See also* U.S.S.C., "'Back in Business' U.S. Sentencing Commission Acts to Make Communities Safer & Stronger," Apr. 5, 2023, *available at* https://www.ussc.gov/about/news/press-releases/april-5-2023.

DEFENDANT'S SENTENCING MEMORANDUM, MOTION FOR DOWNWARD VARIANCE AND PSR OBJECTIONS
*United States v. Soong*, 3:22-CR-00372-SI

15

commentary to U.S.S.G. § 5C1.1 to state that defendants receiving an adjustment under U.S.S.G. § 4C1.1 whose Guideline ranges are not in Zones A and B of the Sentencing Table may nonetheless receive "a sentence other than a sentence of imprisonment" if the "the defendant's applicable Guideline range overstates the gravity of the offense because the offense of conviction is not a crime of violence or an otherwise serious offense." Exh. F at 16 (amending U.S.S.G. § 5C1.1 app. n. (4)(B)).

Mr. Soong meets the criteria for a two-level decrease promulgated in proposed U.S.S.G. § 4C1.1(a) as recognized by the probation office. PSR ¶ 112. He has no criminal history points and did not use threats of violence; the offense did not result in death or injury, is not a sex offense, did not cause "substantial financial hardship," did not involve weapons or a violation of individual rights under U.S.S.G. § 2H1.1, and Mr. Soong did not receive any upward adjustments under Chapter 3 of the Guidelines. Exh. F at 10-11. Thus, if Mr. Soong were sentenced after November 1, 2023, the offense level for the same exact conduct would decrease from 23 to 21, and the advisory Guideline range would decrease from 46-57 months to 37-46 months under the Sentencing Guidelines both the government and probation office believe apply. *See* PSR ¶¶ 54, 90, 112. And if the Court adopts the Guideline calculations Mr. Soong believes applies, the adjusted offense level would decrease from 12 to 10, and the corresponding Guideline range would lower from 10-16 months to 6-12 months.

Regardless of what the ultimate Guideline range is, this Court can and should account for this upcoming Sentencing Guidelines amendment by granting a downward variance in this case to a sentence of five years of probation. The preliminary Amendment make clear that a zero-point offender in Zones C or D of the sentencing table may be spared imprisonment if "the defendant's applicable Guideline range overstates the gravity of the offense because the offense of conviction is not a crime of violence or an otherwise serious offense." Exh. F at 16 (amending U.S.S.G. § 5C1.1 app. n. (4)(B)). That is the case here. There is no question that Mr. Soong was not convicted of a crime of violence.

While there is no definition of what the Commission means by a "serious offense," the kinds of offenses listed in the text of § 4C1.1—sex crimes and civil rights violations or crimes with aggravated conduct that further terrorism or hate crimes, or involve aggravating role and substantial

financial hardship to victims—give insight into what kinds of crimes the Guidelines deem "serious"
enough to justify imprisoning a first offender with no prior criminal history whatsoever. Mr. Soong's
conduct is certainly serious in that he has been convicted of a felony and has agreed to pay restitution.
But it is not "serious" as contemplated in the newly promulgated § 4C1.1 and amended § 5C1.1 to
justify imprisoning him. That is particularly true when the Court considers all the other mitigating
factors present here, including Mr. Soong's "history of emotional neglect during his formative years,"
his genuine and deep remorse for his actions, and the rehabilitative steps he is taking to better
understand who he is and how he got here. PSR ¶ 113.

**C.    Providing Training, Medical Care or Other Treatment.**

      The "purposes of sentencing include not only punishment and deterrence, but also the provision
of treatment to a defendant in need of it." *United States v. Bad Marriage*, 392 F.3d 1103, 1114 (9th
Cir. 2004) (citing 18 U.S.C. § 3553(a)(2)(D)). Congress has cautioned courts to recognize that
"imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. §
3582(a). Instead, Congress has directed district courts to consider "the most effective manner" to
provide a defendant with "correctional treatment." 18 U.S.C. § 3553(a)(2)(D).

      Mr. Soong needs and wants continued mental health treatment and counseling as recommended
by the Probation Office. PSR ¶ 73, PSR Sentencing Rec. at 4, ¶ 4. Incarcerating Mr. Soong will
disrupt the treatment and counseling he has under his feet already, which has helped him understand
the decisions he made that brought him to Court. Placing him on probation is thus "the most
effective" way to provide Mr. Soong with the treatment and medical care he needs to put this incident
behind him.

**D.    The Guidelines Sentencing Range.**

      Mr. Soong objects to the government and probation office's belief that the base offense level is
26 under U.S.S.G. § 2M5.1(a)(1). Instead, Mr. Soong maintains the base offense level should be 14
under U.S.S.G. § 2M5.1(a)(2).

      **1.    The base offense level is 14 under U.S.S.G. § 2M5.1(a)(2).**

      Under U.S.S.G. § 2M5.1, if the offense involves either (1) the evasion of "national security
controls or controls relating to the proliferation of nuclear, biological, or chemical weapons" or (2) "a

1    financial transaction with a country supporting international terrorism," the base offense level is 26.

2    U.S.S.G. § 2M5.1(a)(1). In all other cases, the base offense level is 14. U.S.S.G. § 2M5.1(a)(2).

3        It is clear the offense here does not involve "a financial transaction with a country supporting

4    international terrorism" under U.S.S.G. § 2M5.1(a)(1)(B). Guidelines commentary states "'a country

5    supporting international terrorism' means a country designated under section 6(j) of the Export

6    Administration Act (50 U.S.C. App. 2405)." U.S.S.G. § 2M5.1 app. n. 4. The Export Administration

7    Act ("EAA") was repealed and replaced with the Export Controls Act of 2018, which continued the

8    designations within the EAA. *See* 50 U.S.C. § 4813(c). There are currently only four countries that

9    have been designated by the Department of State to be sponsors of terrorism: Cuba, North Korea,

10    Iran, and Syria. This case does not involve a financial transaction with any of those countries.

11        Thus, the heightened base offense level would only apply to Mr. Soong's conduct if the offense

12    involved the evasion of (1) "national security controls," or (2) "controls relating to the proliferation

13    of nuclear, biological, or chemical weapons." U.S.S.G. § 2M5.1(a)(1)(A). This case involves neither.

14        No "national security controls" were evaded when CIFER was exported to Beihang. The few

15    reported cases analyzing the phrase "national security controls" in § 2M5.1(a)(1) have found it

16    applied when an export violated an Executive decision to embargo trade with a country deemed a

17    national security threat. Unsurprisingly, these cases all involved export to countries classified as a

18    state sponsor of terrorism. *See United States v. Hanna*, 661 F.3d 271, 293 (6th Cir. 2011) (applying

19    heightened base offense level to export in violation of embargo with Iraq when it was deemed state

20    sponsor of terrorism); *United States v. Elashyi*, 554 F.3d 480, 509 (5th Cir. 2008) (holding "that

21    export regulations targeted against state sponsors of terrorism are 'national security controls' under

22    2M5.1(a)" in case involving export to Syria); *United States v. McKeeve*, 131 F.3d 1, 14 (1st Cir.

23    1997) (export in violation of embargo with Libya, which was designated state sponsor of terrorism at

24    the time, was a "national security control" for U.S.S.G. § 2M5.1); *United States v. Sevilla*, 2006 WL

25    3486872, at *3 (N.D. Ill. Nov. 29, 2006) (applying heightened base offense level when defendant

26    "attempted to evade export controls to a country to which an embargo exists against because of

27    national security concerns," specifically Iran); *United States v. Min*, 2000 WL 1576890, at *2

28    (S.D.N.Y. Oct. 23, 2000) (applying heightened base offense level to export to North Korea because

1    "The embargo on the shipment of goods to North Korea is unquestionably based on national security

2    concerns. The nature of the goods, innocuous or other, is not controlling."). Here, as explained

3    earlier, there was no export to a country deemed a state sponsor of terrorism.

4         Moreover, the interests implicated in IEEPA are broader than merely dealing with threats to

5    national security. IEEPA permits the President to deal with "any unusual and extraordinary threat,

6    which has its source in whole or substantial part outside the United States, to the *national security,*

7    *foreign policy, or economy of the United States*." 50 U.S.C. § 1701(a) (emphasis added). In other

8    words, an IEEPA violation does not in and of itself mean that a restriction on export is tied to

9    national security concerns; rather a restriction could be tied to more general foreign policy or

10   economic concerns. That point is reinforced by the text of U.S.S.G. § 2M5.1 itself, which

11   distinguishes between more serious and aggravated export violations—which trigger the heightened

12   base offense level of 26—and less serious export violations that do not involve national security

13   threats, and thus trigger a base offense level of 14. The breadth of IEEPA manifests itself specifically

14   in this case. China has been deemed a threat to the United States' foreign policy and economic

15   interests; FBI Director Christopher Wray is quoted on the FBI's website as saying "The greatest long-

16   term threat to our nation's information and intellectual property, and to our economic vitality, is the

17   counterintelligence and economic espionage threat from China."[10] Obviously those are important

18   interests, but they are not comparable to the "national security" threat from countries like Iran and

19   North Korea, whose leaders have threatened to attack and destroy the United States. Thus, a "national

20   security control" was not evaded by the export of CIFER to Beihang University, and that cannot be

21   the basis of finding the base offense level is 26 under U.S.S.G. § 2M5.1(a)(1)(A).

22        Nor did the export of CIFER to Beihang involve evading a control "relating to the proliferation

23   of nuclear, biological, or chemical weapons." U.S.S.G. § 2M5.1(a)(1)(A). As USRA explained itself

24   to the Department of Justice ("DOJ"), the export did not involve "items controlled for nuclear

25   proliferation or missile technology reasons to a proliferator country;" "items known to be used in the

26   construction of weapons of mass destruction," exports to "a foreign terrorist organization or specially

27

28   _____

[10] *See* https://www.fbi.gov/investigate/counterintelligence/the-china-threat.

1  designated global terrorist," or "exports of military items to a hostile foreign power." Exh. G, USRA-

2  000803.

3      Beihang University was added to the "Entity List" in 2001. *See* 66 Fed. Reg. 24266. The Code

4  of Federal Regulations ("C.F.R.") entry for Beihang makes clear a license is required to export "all

5  items subject to the EAR" to Beihang and cites 15 C.F.R. § 744.3(d) for "license review policy." *See*

6  15 C.F.R. § Pt. 744, Supp. 4.

7      Unlike other actors on the "Entity List," the C.F.R. entry for Beihang does not cite to § 744.11

8  of the EAR.[11] That omission is critical: 15 C.F.R. § 744.11 specifically requires a license for exports

9  to entities deemed to pose a risk to "national security or foreign policy interests of the United States."

10  The canons of statutory interpretation apply when interpreting regulations. *See Flores-Chavez v.*

11  *Ashcroft*, 362 F.3d 1150, 1157 (9th Cir. 2004). "When Congress uses particular language in one part

12  of a statute and omits it elsewhere, it is generally presumed that Congress acts intentionally and

13  purposely in the disparate inclusion or exclusion." *Tin Cup, LLC v. United States Army Corps of*

14  *Engineers*, 904 F.3d 1068, 1073 (9th Cir. 2018) (quotations and citation omitted). That principle

15  applies here as well. Thus, the absence of a citation to 15 C.F.R. § 744.11 was intentional and means

16  the prohibition on unlicensed exports to Beihang is not because it poses a "national security" risk to

17  the United States.

18      Also critical is the citation to 15 C.F.R. § 744.3(d) for license review. Section 744.3 governs

19  license requirements for rocket systems, including unmanned aerial vehicles. The license review

20  standard in § 744.3(d) calls for "a case-by-case basis to determine whether the export, reexport or

21  transfer (in-country) would make a material contribution to the proliferation of certain rocket

22  systems, or unmanned aerial vehicles." 15 C.F.R. § 744.3(d)(1). The heightened base offense level in

23  U.S.S.G. § 2M5.1(a)(1) does not apply when an export evades a control relating to the proliferation

24  of rocket systems. Notably, in other places, the EAR differentiates between controls relating to

25  "national security," "nuclear," "chemical and biological" and "missile technology." *See, e.g.,* 15

26

27  [11] For example, the entry immediately after Beihang University is for Beijing University of Posts and Telecommunications (BUPT). Its entry states a license is required for "All items subject to the EAR.

28  (See § 744.11 of the EAR)" and under "license review policy," states there is a "presumption of denial."

DEFENDANT'S SENTENCING MEMORANDUM, MOTION FOR DOWNWARD VARIANCE AND PSR OBJECTIONS
*United States v. Soong*, 3:22-CR-00372-SI

20

C.F.R. § Pt. 740, Supp. 1, Country Group D. While a control motivated by the first three of those concerns could trigger the heightened base offense level under the plain text of U.S.S.G. § 2M5.1, the final category of "missile technology"—which appears to be the control animating the inclusion of Beihang on the "Entity List"—does not trigger the heightened § 2M5.1 base offense level.

The fact CIFER was not regulated under the International Traffic in Arms Regulations ("ITAR"), 22 U.S.C. § 2778, is also important. Exh. G, USRA-000804 (USRA informing DOJ that "STA software was not deemed to be regulated by ITAR" and "no license was required for most exports."). The Guideline for ITAR violations, U.S.S.G. § 2M5.2, has a base offense level of 26 for almost all violations except those involving two "small arms," or less than 500 rounds of ammunition. *See* U.S.S.G. § 2M5.2(a)(1). Equating the IEEPA violation here with an ITAR violation is illogical, would lead to sentencing disparity, and supports the conclusion that this is a case where the lowered base offense level of 14 is appropriate.

Other courts have found the lower offense level of 14 under U.S.S.G. § 2M5.1(a)(2) applies in situations even more aggravated than the one here. For example, in *United States v. Gong*, 6:16-CR-00173-PGB-GJK (M.D. Fl.), the defendant pleaded guilty to one count of conspiracy to smuggle goods outside the United States in violation of export laws. Exh. H. The defendant, a Chinese national and resident, served as a straw purchaser of "aerospace parts" from U.S. companies, and represented her business in China was the end user when in truth, the ultimate end user was located in Iran. *Id.* at 21-22. In the plea agreement, the government agreed to a lower base offense level of 14 under U.S.S.G. § 2M5.1(a)(2). *Id.* at 4-5.

In *United States v. Israel*, 1:13-CR-00572 (N.D. Ill.), the defendant pleaded guilty to failing to register as an agent for a foreign principal. Exh. I at 2. The defendant agreed to serve as a foreign agent for government officials in Zimbabwe, including president Robert Mugabe, in exchange for more than $3 million. *Id.* at 4. The U.S. government had "imposed restrictions on travel and economic trade to and from Zimbabwe and…barred transactions with certain Zimbabwean individuals and entities" because of "their history of human rights abuses, election fraud, and voter intimidation." *Id.* at 3. Nonetheless the government agreed that the base offense level was 14 under U.S.S.G. § 2M5.1(a)(2). *Id.* at 10.

Thus the base offense level here should be 14 under U.S.S.G. § 2M5.1(a)(2). Because Mr. Soong has pleaded guilty and accepted responsibility for his mistakes, he should receive a two-level downward adjustment under U.S.S.G. § 3E1.1(a). Thus, the adjusted offense level is 12. Mr. Soong has zero criminal history points and is in criminal history category I, resulting in an advisory Guideline range of 10-16 months. As explained earlier, if Mr. Soong were sentenced after November 1, 2023, he would receive another two-level downward adjustment under proposed U.S.S.G. § 4C1.1, which would lead to an adjusted offense level of 10, and a corresponding Guideline range of 6-12 months.

**2.    Regardless of the Guideline range, all parties agree a variance is appropriate.**

Ultimately, even though both the government and the probation office believe the heightened base offense level in U.S.S.G. § 2M5.1(a)(1) applies, neither are asking the Court to impose a sentence within the corresponding Guideline range (46-57 months) or even the corresponding Guideline range if the Court adopted the heightened base offense level and gave Mr. Soong the benefit of the new two level downward adjustment in proposed U.S.S.G. § 4C1.1 (37-46 months).

As this Court knows the Supreme Court has made clear that the ranges recommended by the Sentencing Guidelines are neither mandatory nor presumptively reasonable. Instead, at sentencing courts have an "overarching duty" to "'impose a sentence sufficient, but not greater than necessary'" to comply with the sentencing factors in 18 U.S.C. § 3553(a). *Pepper*, 562 U.S. at 491 (quoting § 3553(a)).

The Guideline range only considers the aggravating factors in Mr. Soong's case. The probation office notes several mitigating factors supporting a variance, including Mr. Soong's "history of emotional neglect during his formative years," PSR ¶ 113, the fact "the offense of conviction is not a crime of violence," Mr. Soong's "expressed remorse for his conduct and the potential harm of his actions," his initiation of "therapeutic services to address the issues" leading to the crime, and "his lack of criminal history." PSR Sentencing Rec. at 2-3.

Thus a downward variance from the advisory Guideline range is appropriate in this case. Mr. Soong asks this Court to grant him a variance down to probation and spare him from incarceration.

DEFENDANT'S SENTENCING MEMORANDUM, MOTION FOR DOWNWARD VARIANCE AND PSR OBJECTIONS
*United States v. Soong*, 3:22-CR-00372-SI

22

**E.** __Avoiding Unwarranted Sentencing Disparities.__

While the Court must avoid unwarranted sentencing disparities among defendants with similar records convicted of similar conduct, the Ninth Circuit has explained sentencing courts must also "avoid 'unwarranted similarities among [defendants] who were not similarly situated.'" *United States v. Amezcua-Vasquez*, 567 F.3d 1050, 1058 (9th Cir. 2009) (quoting *Gall,* 552 U.S. at 55 (emphasis and brackets in original)); *see also* 18 U.S.C. § 3553(a)(6).

Placing Mr. Soong on probation would not lead to sentencing disparity. Analyzing more than ten years of Sentencing Commission data, researcher Jordan Schaer found that the probation rate for defendants sentenced under U.S.S.G. § 2M5.1—regardless of which base offense level applies—have a higher probation rate than other defendants convicted of other crimes with the same offense level and criminal history category. Exh. J, U.S.S.C. Data Analysis.

For defendants with a final offense level of 12 and criminal history category I, the probation rate nationally is 32%.[12] Exh. J, U.S.S.C. Data Analysis at 4. But for defendants sentenced under § 2M5.1 at final offense level 12 and criminal history category I, the probation rate is 35%. *Id.* at 6. Even when looking at the higher § 2M5.1 offense level, the probation rate for defendants with an adjusted offense level 23 and criminal history category I was almost 20%, four times the 5% probation rate for defendants sentenced nationally under other Guidelines with a final offense level of 23 and in criminal history category I, and almost three times the 6.8% probation rate in the Northern District for those defendants. Exh. J, U.S.S.C. Data Analysis at 10, 12. In other words, Courts have recognized that the offenses covered under U.S.S.G. § 2M5.1 are less aggravated than other offenses generating similar Guideline ranges and so have been more receptive to sparing § 2M5.1 defendants prison.

Conversely, imposing a prison sentence on Mr. Soong would unfairly equate him with dissimilar defendants convicted of more aggravated export violations in the Northern District of California. For example, in *United States v. Shor, et al.*, 5:10-CR-00434-RMW (N.D. Cal.), two defendants were sentenced to 18 months and 12 months and 1 day in prison, respectively, for their

---

[12] The probation rate for those defendants in the Northern District of California is 48%. Exh. J, U.S.S.C. Data Analysis at 4.

1   role in conspiring to violate ITAR—which has a base offense level of 26 under U.S.S.G. § 2M5.2—

2   by attempting to export 400 handguns, 200,000 rounds of 9 millimeter ammunition and 50,000 tear

3   gas grenades to an undercover agent the defendants believed was brokering a deal on behalf of the

4   government of the Ivory Coast, a country under a United Nations arms embargo. *See United Shor, et*

5   *al.,* 5:10-CR-00434-RMW (N.D. Cal.), Dkt. 87, United States' Sentencing Memorandum at 2-4.

6           Mr. Soong acknowledges and understands the criticism that educated defendants convicted of

7   financial crimes are given lenient treatment compared to other non-violent defendants of color going

8   through the federal criminal justice system. But placing Mr. Soong on probation would not perpetuate

9   those disparities in the criminal justice system. Rather, it is an individualized recognition of Mr.

10  Soong's unique characteristics, as recognized by the probation office itself, including his upbringing

11  filled with emotional neglect, the steps he took on his own initiative to repay the money he took from

12  USRA and to undertake therapy to understand the root causes of his behavior, and the Sentencing

13  Commission's recognition that "zero-point" offenders like Mr. Soong have a low risk of recidivism

14  and can be spared imprisonment.

15  **F.    Providing Restitution.**

16          Mr. Soong has agreed to pay restitution as a condition of his plea agreement. The PSR indicates

17  the amount of restitution owed is $168,885. Mr. Soong previously repaid $161,010 to USRA, which

18  will be transferred to the clerk of the Court to offset the restitution amount. PSR ¶ 41. That leaves a

19  remaining balance of $7,875.00 which Mr. Soong anticipates paying on the day of sentencing, or

20  shortly afterwards.

21          **OBJECTIONS TO PROPOSED SUPERVISED RELEASE CONDITIONS**

22          Mr. Soong objects to proposed conditions of supervised release 7, 8, 9, 10 and 11, which

23  generally place restrictions on Mr. Soong's ability to use a computer and access the Internet, as well

24  as requires him to enroll in the District's Computer and Internet Monitoring Program ("CIMP"). PSR

25  Sentencing Rec. at 6-7.

26          Although "District judges enjoy broad discretion in fashioning" supervised release conditions,

27  "Congress has nonetheless set limits on the exercise of that discretion." *United States v. LaCoste*, 821

28  F.3d 1187, 1190 (9th Cir. 2016). There are "three primary constraints" on imposition of supervised

1    release conditions. *Id.* The condition must (1) "be reasonably related to the nature and circumstances

2    of the offense; the history and characteristics of the defendant; or the sentencing-related goals of

3    deterrence, protection of the public, or rehabilitation;" (2) be consistent with the Sentencing

4    Commission's policy statements; and (3) must involve "no greater deprivation of liberty than is

5    reasonably necessary to serve the goals of supervised release." *Id.* at 1190-91 (quotations and

6    citations omitted).

7        Because proposed conditions 7, 8, 9, 10 and 11 are not "reasonably related" to the offense and

8    involve "a greater deprivation of liberty" than necessary to accomplish the goals of supervised release

9    they should be stricken.[13]

10   **A.    <u>The computer and Internet restrictions are not reasonably related to the offense.</u>**

11       The probation office claims Mr. Soong "used a computer and third-party applications to engage

12   in the instant offense," as well as "an on-line computer service." PSR Sentencing Rec. at 6-7, ¶¶ 7, 8,

13   9, 10, 11. But that is insufficient to support a restriction on computer or Internet use.

14       A "mere nexus between the crime and a computer does not justify proscribing the use of

15   anything containing a circuit board or microchips." *United States v. Barsumyan*, 517 F.3d 1154, 1161

16   (9th Cir. 2008). The Ninth Circuit has made clear that restrictions on computer and Internet use—

17   including restrictions that do not prohibit a defendant from using a computer or Internet but merely

18   require prior approval from a probation officer—are only justified in two "limited circumstances:"

19   when "use of the Internet was 'essential' or 'integral' to the offense of conviction, or when the

20   Internet played no role in the offense of conviction but the defendant had a history of using the

21   Internet to commit other offenses." *LaCoste*, 821 F.3d at 1191. Mr. Soong has no prior criminal

22   record whatsoever, and so the second circumstance is inapplicable here.

23       While Mr. Soong's offense did involve the use of a computer, that was not an "essential" or

24   "integral" aspect of the offense as it would be in a prosecution for possession of child pornography.

25

26   _____

27   [13] There are no Sentencing Guideline policy statements concerning electronic and Internet
     monitoring. The Guidelines state discretionary conditions of supervised release must be "reasonably
     related" to the offense and the defendant and must involve "no greater deprivation of liberty than is

28   reasonably necessary." U.S.S.G. § 5D1.3(b). Because neither factor is present as explained above, the
     proposed conditions are also inconsistent with the Sentencing Commission's policy statements.

*See Barsumyan*, 517 F.3d at 1161, n. 11 (noting Ninth Circuit "has upheld conditions restricting Internet access in cases involving child pornography" because of "the strong link between child pornography and the Internet, and the need to protect the public, particularly children, from sex offenders.") (quotations and citations omitted). Computers and the Internet are an essential part of everyday life and the mere fact that this case involves the transfer of software by the Internet and the diversion of money through an app does not justify a computer and Internet use restriction. Indeed, at least as of 2008 the Ninth Circuit had noted it was "aware of no published cases approving Internet restrictions imposed on a defendant convicted of a nonsexual offense—let alone a restriction on all computer-related devices, whether Internet-capable or not." *Barsumyan*, 517 F.3d at 1161 n. 11; *see also United States v. Sales*, 476 F.3d 732, 736–37 (9th Cir. 2007) (rejecting restrictions on Internet and computer use as condition of supervised release for defendant convicted of counterfeiting who used computer to "employed a scanner, computer, and printer to counterfeit currency"); *United States v. Avila*, 719 F. App'x 591, 594–95 (9th Cir. 2017) (rejecting computer and Internet use restrictions on defendant found in violation of supervised release for discharging firearm and possessing ammunition as felon).

This case is almost identical to *LaCoste*, where a defendant convicted of conspiracy to commit securities fraud was ordered to not use the Internet without prior approval from his probation officer while on supervised release. 821 F.3d at 1189. Reviewing for plain error, the Ninth Circuit vacated the condition. It found "LaCoste's use of the Internet played only a tangential role in his commission of the underlying fraud offense," specifically "to communicate by email with investors and his co-conspirators" and to use "the Internet to post disparaging comments about some of his victims." *Id.* at 1192. The fact that the condition was not a total ban but required prior approval of the probation office could not otherwise save the condition. *Id.*

Thus the proposed conditions should be stricken since they are neither reasonably related to the offense nor Mr. Soong specifically.

**B.    The proposed conditions impose greater restrictions on liberty than necessary.**

Additionally, the computer and Internet use conditions impose a "greater deprivation of liberty" than necessary to serve the goals of supervised release. *LaCoste*, 821 F.3d at 1192. "Use of the

Internet is vital for a wide range of routine activities in today's world—finding and applying for work, obtaining government services, engaging in commerce, communicating with friends and family, and gathering information on just about anything, to take but a few examples. Cutting off all access to the Internet constrains a defendant's freedom in ways that make it difficult to participate fully in society and the economy." *Id.* at 1191.

The proposed conditions will significantly impair Mr. Soong's ability to perform his job and make a living, which will ultimately conflict with the goals of rehabilitation and deterrence. Mr. Soong is an IT professional who has finally found a rewarding career. PSR ¶¶ 77, 80. The computer use conditions will make it impossible for him to perform his job, as his employer would certainly not agree to allow the probation office to install monitoring software on its computer systems or allow the probation office to inspect its proprietary systems. Mr. Soong's conviction means he will no longer be allowed to see classified government material, and his current employment is not with a company that is in the business of exporting software.

Finally, the conditions are redundant of proposed special condition 6, which requires Mr. Soong to submit his "electronic devices and their data" to a search by Probation with or without reasonable suspicion. PSR Sentencing Rec. at 5, ¶ 6. Mr. Soong agreed to this expansive search condition in his plea agreement. The conditions are also redundant of proposed special conditions 1 and 3, which prohibit Mr. Soong from serving as a fiduciary without prior permission of the probation office and requires him to disclose financial records to the probation office. PSR Sentencing Rec. at 4, ¶¶ 1, 3. As the probation officer notes, these conditions are designed to "prevent any further crimes," and "ensure[s] [Mr. Soong's] future income is from legitimate sources." *Id.* Given these unchallenged conditions, there is no need to further require Mr. Soong to be subject to computer and Internet use restrictions and monitoring.

Proposed special conditions of supervised release 7, 8, 9, 10, and 11 should be stricken.

## CONCLUSION

Mr. Soong's self-imposed mistakes have taken a heavy toll on him. He is a convicted felon who has lost three jobs and will forever live with the fear that he will be fired at a moment's notice, unable to financially support his family. The silver lining in this dark chapter in Mr. Soong's life is that he

1    finally undertook a long-neglected journey to understand who he is and how he became a defendant

2    in a federal criminal case. He understands part of that journey involves receiving the punishment

3    handed down by this Court, and he accepts whatever decision this Court will make. Regardless of the

4    outcome, he is committed to continuing to understand and improve himself.

5        Mr. Soong has learned his lesson and been punished enough. The mere fact of his prosecution

6    sends a loud and clear message that the government will pursue and prosecute anyone who violates

7    export law and diverts money from their employer into their own pocket.

8        Mr. Soong does not need to go to prison. He respectfully requests this Court sentence him to

9    five years of probation with the condition that he participate in mental health counseling and

10   treatment. He also asks this Court to order any restitution amount be offset by the $161,010.00 he

11   previously paid to USRA.

12

13       Dated:    April 21, 2023                    Respectfully submitted,

14                                                    MOEL LAH FAKHOURY LLP

15

16

17                                                   Hanni M. Fakhoury
                                                     Attorneys for Jonathan Soong

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT'S SENTENCING MEMORANDUM, MOTION FOR DOWNWARD VARIANCE AND PSR OBJECTIONS
*United States v. Soong*, 3:22-CR-00372-SI
28